*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0429p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

STELLA ROMANSKI,

        *Plaintiff-Appellee,*

    *v.*

No. 04-1354

DETROIT ENTERTAINMENT, L.L.C., d/b/a/ MotorCity
Casino, a Michigan Limited Liability Company;
MARLENE BROWN,

        *Defendants-Appellants,*

GLORIA BROWN; ROBERT EDWARDS; and JOETTA
STEVENSON,

        *Defendants.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-73358—Lawrence P. Zatkoff, District Judge.

Argued: April 27, 2005

Decided and Filed: October 28, 2005

Before: KEITH, CLAY, and FARRIS, Circuit Judges.[*]

---

## COUNSEL

**ARGUED:** Megan K. Cavanagh, GARAN LUCOW MILLER, P.C., Detroit, Michigan, for
Appellants. Neil H. Fink, LAW OFFICES OF NEIL H. FINK, Birmingham, Michgian, for
Appellee. **ON BRIEF:** Megan K. Cavanagh, Rosalind Rochkind, Robert F. MacAlpine, GARAN
LUCOW MILLER, P.C., Detroit, Michigan, for Appellants. Neil H. Fink, LAW OFFICES OF
NEIL H. FINK, Birmingham, Michgian, Richard G. Lewandowski, S. David McNeill, FREEMAN
McNEILL, Birmingham, Michigan, for Appellee.

CLAY, J., delivered the opinion of the court, in which KEITH, J., joined. FARRIS, J. (pp.
18-19), delivered a separate dissenting opinion.

---

[*] The Honorable Jerome Farris, Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting
by designation.

————————————

**OPINION**

————————————

CLAY, Circuit Judge.  A jury in the Eastern District of Michigan found Defendants Detroit Entertainment, L.L.C., which owns and operates the MotorCity Casino (we refer to both as "the casino"), and Marlene Brown, one of the casino's security personnel and a private security police officer with the power to arrest, liable under 42 U.S.C. § 1983 and under Michigan law for unlawfully arresting Stella Romanski. Defendants contend the judgment must be reversed and a new trial granted because the district court instructed the jury as a matter of law that Defendants acted under color of state law at all times relevant to this case.  Defendants also raise other instruction-related claims.  In the alternative, Defendants ask us to remit some of the $875,000 punitive damages award or order a new trial on the issue of damages.

We **AFFIRM** the judgment of the district court in all respects except that we **VACATE** the portion of the judgment comprised by the punitive damages award and **REMAND** for a remittitur of the punitive damages award, in accordance with the instructions of this opinion, or a new trial on the issue of punitive damages.  The remarkable facts of this case make it indisputable that a substantial punitive damages award is warranted.  Defendants' conduct was particularly egregious and a higher award to deter the casino from sanctioning such conduct in the future was appropriate. But an award of $600,000 will just as adequately serve the interests of punishment and deterrence and fits more comfortably in the ballpark of punitive awards that have been upheld in similar cases. We therefore order a remittitur to that amount or, if Romanski so chooses, a new trial on damages.

**I. BACKGROUND**

On August 7, 2001, Romanski, then 72 years old, and her friends Dorothy Dombrowski and Linda Holman, went to Defendant Detroit Entertainment's MotorCity Casino in Detroit, Michigan, to gamble and enjoy lunch at the buffet.  After a spate of unsuccessful tries at the slot machines, Romanski took a walk around the gaming floor.   During her walk, Romanski noticed a five cent token lying in a slot machine's tray.  Seeing no chair at the machine, she picked up the token and returned to the machine at which she had earlier played, intending to use the token there.  Soon a uniformed male casino employee approached and asked that she accompany him to the office.  She asked why but he did not answer.  Romanski then noticed there were also three female casino employees, these not in uniform, surrounding her; she felt she could not move.

One of these plain-clothed security officers was Defendant Marlene Brown, who had been assigned to patrol the casino floor at that time.  Brown testified that she approached Romanski, displayed her casino security badge, and began to explain it was the casino's policy not to permit patrons to pick up tokens, which appeared to be abandoned, found at other slot machines, a practice known as "slot-walking."  Romanski could not have known this at the time because the casino does not post the so-called policy anywhere.  It is undisputed, therefore, that Romanski did not have – and could not have had – notice of the casino's purported policy on slot-walking.

According to Brown, Romanski became loud and belligerent, so, at the advice of Brown's supervisor, JoEtta Stevenson (a defendant below), Brown escorted Romanski to an off-the-floor room where Brown intended to explain the policy in detail.  For her part, Romanski testified that Brown did not detain her because of her attitude but rather because Brown suspected her of theft.

It is undisputed that Brown and her colleagues escorted Romanski to what Defendants alternately call the "security office" and the "interview room."  Whatever its name, the room is small and windowless, located off the casino's floor.  According to Romanski, once they had taken

their seats, Brown accused Romanski of stealing the token, whereupon Brown counted Romanski's money and removed one nickel from Romanski's winnings. Stevenson asked Romanski to turn over her social security card and driver's license; Romanski complied and these items were photocopied. Romanski was then photographed. Romanski testified that she acquiesced to these requests because Brown said she was a police officer, had a badge, and appeared to have handcuffs. Brown admitted having presented her badge and possessing handcuffs but testified that she identified herself only as a "security police officer," not as a bona fide police officer. There is no dispute that a uniformed casino security officer stood just outside the room for the duration of the questioning.

Romanski was ejected from the casino for a period of 6 months; Stevenson made the final decision to eject, or "86," Romanski. The precise ground for ejecting Romanski is unclear from the record. Although unknown to Romanski at the time, it is now undisputed that Brown and some of her colleagues on the casino's security staff were licensed under state law as "private security police officer[s]." Mich. Comp. Laws (M.C.L.) § 338.1079. By virtue of being so licensed, a private security police officer has "the authority to arrest a person without a warrant as set forth for public peace officers . . . when that private security police officer is on the employer's premises." M.C.L. § 338.1080. The statute additionally requires that private security police officers make arrests only when they are on duty and in "the full uniform of the[ir] employer." *Id.* It is undisputed that Brown was on duty during the events of this case. It is also undisputed that Brown was not wearing the uniform worn by some of the other security guards, but Defendants have never contended that this rendered Brown out of uniform for purposes of § 338.1080; indeed, Defendants have conceded from the beginning that the statute applies in this case. Their argument is simply that the power admittedly conferred on Brown by the statute did not make her actions under color of state law. *See* 42 U.S.C. § 1983.

Brown was in charge of escorting Romanski to the valet parking area of the casino, where Romanski was to wait for her 3 p.m. bus home. Brown and her colleagues denied Romanski's request to meet her friends for lunch at the buffet – indeed, they did not permit Romanski to eat lunch at all. In addition, they did not permit Romanski to enter the restroom by herself; Brown accompanied Romanski into the restroom and waited outside the stall. At 3 p.m., Romanski exited the valet area to board what she thought was her bus; it turned out not to be but instead of returning to the valet area she ran into her friends and stayed outside. It was extremely hot and humid and Dombrowski and Holman persuaded Romanski to return to the casino. Upon entering, the three were confronted by casino employees, who directed them to return to the valet area, which is air-conditioned; they waited there until the bus arrived.

It is undisputed that Brown prepared an incident report following Romanski's ejection in which Brown referred to Romanski as a "suspect." Romanski introduced the casino's security manual into evidence; it instructs security employees to refer to patrons as "suspects" only if the employee arrested the patron and otherwise to refer to the patron as a "subject." Stevenson confirmed that this policy was in effect when Romanski was ejected. Finally, it is undisputed that as a matter of course, the casino notifies the Michigan State Police when it ejects someone; the casino notified the Michigan State Police of Romanski's ejection.

As these facts reflect, Defendants' treatment of Romanski was inexplicable and egregious. The district court aptly expressed the egregiousness of Defendants' conduct in its opinion denying Defendants' motion for summary judgment: "There is sufficient evidence to allow a jury to find that after [Romanski] picked up an abandoned token that Defendants – by using the authority vested in them by the State of Michigan – surrounded her, arrested her, led her to the security office, prevented her from leaving the security office, and stole the five cents that she found from her. Afterwards, they surrounded her as they threw her out of the casino, and refused to let her use the restroom by herself. Defendants also prevented her from having lunch with her friends [and] falsely told her friends that she had stolen from them . . . . [A] jury could certainly exclaim 'Outrageous.'"

*Romanski v. Detroit Entertainment*, *L.L.C.*, 265 F. Supp. 2d 835, 848-49 (E.D. Mich. 2003) (citations omitted).  Indeed, a jury *did* make such an exclamation: it found in Romanski's favor and made a substantial punitive damages award.

In November 2001, Romanski sued Defendants MotorCity Casino and two un-named employees of the casino in the Circuit Court of Wayne County, Michigan, alleging false arrest, false imprisonment, defamation, and intentional infliction of emotional distress.  In an amended complaint, Romanski named as defendants Detroit Entertainment, L.L.C., d/b/a MotorCity Casino, Marlene Brown, Gloria Brown, Robert Edwards, and Joetta Stevenson, the individual defendants being the employees involved in Romanski's detention, questioning, and ejection from the casino. The amended complaint also included a new cause of action, namely, a claim under 42 U.S.C. § 1983 that Defendants had violated Romanski's Fourth Amendment rights.  Specifically, Romanski alleged that Defendants, acting under color of state law, had arrested her without probable cause because the token she picked up was abandoned, i.e., not the casino's property.

Defendants removed the action to federal district court in the Eastern District of Michigan. The district court issued an order to show cause "as to whether Defendants' conduct was 'under color of law' for purposes of 42 U.S.C. § 1983" and considered the parties' briefs on the issue.  The court concluded that Brown was acting under color of state law because she possessed the same authority to make arrests that the police enjoy.  Having determined that there was a proper basis for federal jurisdiction, the district court exercised its supplemental jurisdiction over Romanski's state law claims.

The parties conducted discovery from September 2002 through February 2003.  On March 6, 2003, Defendants moved for summary judgment on all claims.  On the § 1983 claim, Defendants argued that they were not acting under color of state law in this case and in any event had probable cause to detain Romanski.  In a published decision, the district court denied Defendants' motion for summary judgment.  265 F. Supp. 835 (E.D. Mich. 2003).  The court held as a matter of law that Defendants had acted under color of state law during the events of this case because Brown, the defendant who initiated Romanski's detention, did so while on duty in her capacity as a licensed private security police officer empowered with the same arrest authority as a public police officer. *Id*. at 841-43.  The court further held that genuine factual disputes precluded summary judgment on the Fourth Amendment claim and Romanski's state law claims.  *Id*. at 844-49.

The trial began on July 15, 2003.  At the close of Romanski's case-in-chief, Defendants moved for judgment as a matter of law on all claims and asked the district court to reconsider its conclusion on the state action[1] question.  The district court declined to rule on the motion, reserving it for a later ruling.  At the charge conference and during the parties' exchange of proposed jury instructions, Defendants again raised the state action question, arguing that the jury should be instructed to find as a matter of fact whether Defendants were acting under color of state law.  The district court disagreed and instructed the jury as follows: "Acting under color of law in this case simply means acting in one's capacity as a licensed security officer with powers to make an arrest on the casino premises.  I instruct you as a matter of law that the defendants were acting under color of law at the time of this incident and you may find that this element has been established."  The other issues in the case were submitted to the jury, which found the casino and Brown liable on the Fourth Amendment wrongful arrest claim and the casino alone liable on the state law false arrest and false imprisonment claims.  The jury did not find any of the defendants liable for defamation or

_____

[1]Throughout this opinion we use the terms "state actor" or "state action" and "acting under color of state law" interchangeably.  As the Supreme Court has held: "[i]f a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes action 'under color of state law' for § 1983 purposes." *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 n.2 (2001) (citing *Lugar v. Edmonson Oil Co*., 457 U.S. 922, 935 (1982)).

intentional infliction of emotional distress but, based on its verdict on Romanski's other claims, the jury awarded $279.05 in compensatory damages. Based exclusively on the verdict in favor of Romanski on her § 1983 claim, the jury awarded $500 in punitive damages against Brown, and $875,000 in punitive damages against the casino.

Defendants moved for a judgment not withstanding the verdict or, in the alternative, for a new trial. *See* Fed. R. Civ. P. 50, 59. The district court denied the motion, resting largely on the reasoning expressed in its summary judgment ruling. The casino and Brown (the only defendants found liable by the jury) brought this timely appeal. They argue that: (1) it was improper for the district court to hold they were state actors as a matter of law and accordingly seek either a new trial or judgment in their favor on the § 1983 claim; (2) in connection with Romanksi's claim that Defendants lacked probable cause to arrest her, the district court gave an erroneous jury instruction on the issue of whether the token was abandoned; (3) apparently in connection only with Defendants' own desire for a jury instruction on a purported common law right of private businesses to detain patrons suspected of theft, the district court erroneously declined to accept Defendants' proposed instruction; and (4) the $875,000 punitive damages award, imposed exclusively on the basis of the jury's finding of liability under 42 U.S.C. § 1983, is so excessive that it does not comport with due process. We consider each claim in turn.

## II. DISCUSSION

### A.    State Action

Section 1983 makes liable only those who, while acting under color of state law, deprive another of a right secured by the Constitution or federal law. 42 U.S.C. § 1983; *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003) (*en banc*); *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). A private actor acts under color of state law when its conduct is "fairly attributable to the state." *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 947 (1982). "The Supreme Court has developed three tests for determining the existence of state action in a particular case: (1) the public function test, (2) the state compulsion test, and (3) the symbiotic relationship or nexus test." *Chapman*, 319 F.3d at 833 (citing *Wolotsky*, 960 F.2d at 1335). *See West v. Atkins*, 487 U.S. 42, 49-50 (1988) (public function); *Flagg Bros.*, 436 U.S. at 157 (same); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 170 (1970) (state compulsion test); *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 721-26 (1961) (symbiotic relationship or nexus test).

The district court concluded that Brown and any of her colleagues similarly licensed as private security police officers pursuant to M.C.L. § 338.1079 were state actors under the public function test. 265 F. Supp. 2d at 841-43. Consistent with this holding, the district court took the state action issue out of the case, granting in effect judgment as a matter of law to Romanski on that issue. Consequently, we review the state action aspect of the district court's decision *de novo* and view all facts in the light most favorable to Defendants. *United States v. Alpine Indus., Inc.*, 352 F.3d 1017, 1022 (6th Cir. 2003); *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 258 (6th Cir. 2000).

Under the public function test, a private entity is said to be performing a public function if it is exercising powers traditionally reserved to the state, such as holding elections, taking private property under the eminent domain power, or operating a company-owned town. *See Flagg Bros.*, 436 U.S. at 157-58 (holding elections); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352-53 (1974) (exercising eminent domain); *Marsh v. Alabama*, 326 U.S. 501, 505-509 (1946) (operating a company-owned town). The Supreme Court has expressly left open the question whether and under what circumstances private police officers may be said to perform a public function for purposes of § 1983. *Flagg Bros.*, 436 U.S. at 163. Nevertheless, as the district court observed, there is a growing body of case law to consult for guidance on this question.

For example, in a decision deemed by both parties and the district court to bear directly on the issue presented in this case, the Seventh Circuit held that private police officers licensed to make arrests could be state actors under the public function test. *Payton v. Rush-Presbyterian*, 184 F.3d 623, 627-30 (7th Cir. 1999). To be sure, *Payton* was an appeal of a dismissal pursuant to Fed. R. Civ. P. 12(b)(6), but we think this distinction is of little relevance since the crucial fact in that case – assumed to be true there but indisputable here – was that by virtue of their status as on-duty special police officers, licensed by the city of Chicago, the defendants enjoyed "virtually the same power as public police officers." *Id*. at 629. Indeed, the defendants in *Payton* operated under an ordinance which provided that special police officers licensed under it "shall possess the powers of the regular police patrol at the places for which they are respectively appointed or in the line of duty for which they are engaged." *Id*. at 625 (quoting Chicago City Code § 4-340-100 (1993)).

This broad delegation of power, the Seventh Circuit reasoned, distinguished *Payton* from an earlier case in which the court had held that a private security guard endowed with more limited police-type powers was not a state actor. *See Wade v. Byles*, 83 F.3d 902, 905-906 (7th Cir. 1996). The defendant in *Wade* was permitted to carry a handgun and to use deadly force in self-defense but could arrest someone only for "trespass pending the arrival of the police" and could exercise these powers only in the lobbies of properties owned by the public housing authority for which he worked. *Id*. at 906. The defendant was not a state actor because, as the court put it in *Payton*, "none of these powers had been exclusively reserved to the police – citizen's arrests and the rights to carry handguns and use them in self-defense are available to individuals outside of the law enforcement community." *Payton*, 184 F.3d at 629 (citing *Wade*, 83 F.3d at 906).

*Payton* illustrates a line that has been drawn in the case law. The line divides cases in which a private actor exercises a power traditionally reserved to the state, but not exclusively reserved to it, e.g., the common law shopkeeper's privilege, from cases in which a private actor exercises a power exclusively reserved to the state, e.g., the police power. Where private security guards are endowed by law with plenary police powers such that they are *de facto* police officers, they may qualify as state actors under the public function test. *See Payton*, 184 F.3d at 630; *Henderson v. Fisher*, 631 F.2d 1115 (3d Cir. 1980) (*per curiam*) (university policemen with plenary police authority throughout the university's campus); *Rojas v. Alexander's Dept. Store, Inc.*, 654 F. Supp. 856 (E.D.N.Y. 1986) (New York City special patrolman with plenary police authority patrolling a department store). The rationale of these cases is that when the state delegates a power traditionally reserved to it alone – the police power – to private actors in order that they may provide police services to institutions that need it, a "plaintiff's ability to claim relief under § 1983 [for abuses of that power] should be unaffected." *Payton*, 184 F.3d at 629; *cf. Henderson*, 631 F.2d at 1118.

On the other side of the line illustrated by *Payton* are cases in which the private defendants have some police-like powers but not plenary police authority. *See Wade*, 83 F.3d at 906-907; *Johnson v. Larabida Children's Hospital*, 372 F.3d 894, 896-97 (7th Cir. 2004) (hospital security guards who had authority to patrol and eject people but not to carry guns and who had to call the police if someone became hostile and belligerent). A subset of these cases are cases in which a private institution's security employees have been dispatched to protect the institution's interests or enforce its policies. The canonical example here is when a store avails itself of the common law shopkeeper's privilege, the privilege at issue in this Court's *en banc* decision in *Chapman v. Higbee Co.*, and the Fifth Circuit case upon which *Chapman* relied. *See Chapman*, 319 F.3d at 833-34 (discussing *White v. Scrivner Corp.*, 594 F.2d 140, 142 (5th Cir. 1979)).

Like the district court, we think this case falls on the *Payton* side of the line. It is undisputed that Brown (and some of her colleagues) were private security police officers licensed under M.C.L. § 338.1079. This means that Brown's qualifications for being so licensed were vetted by Michigan's department of state police, *id*. § (1), and that Brown was subject to certain statutes administered by that department. *Id*. § (2); *see* M.C.L. §§ 338.1067, 338.1069. More critical for present purposes

are the undisputed facts that Brown was on duty and on the casino's premises at all times relevant to this case. These undisputed facts lead to an inescapable conclusion of law – namely, that at all times relevant to this case, Brown "ha[d] the authority to arrest a person without a warrant as set forth for public peace officers . . . ." M.C.L. § 338.1080. One consequence of Brown's possession of this authority, the authority to make arrests at one's discretion and for any offenses, is clear: at all times relevant to this case, Brown was a state actor as a matter of law.[2]

Unlike the common law privileges at issue in *Wade* (the use of deadly force in self-defense, the right to detain for trespass, and the right to carry a weapon) and *Chapman* (the shopkeeper's privilege), which may be invoked by any citizen under appropriate circumstances, the plenary arrest power enjoyed by private security police officers licensed pursuant to M.C.L. § 338.1079 is a power traditionally reserved to the state alone.[3] *See Payton*, 184 F.3d at 630; *Henderson*, 631 F.2d at 1118; *Rojas*, 654 F. Supp. at 858; *Thompson v. McCoy*, 425 F. Supp. 407, 409-10 (D.S.C. 1976). *See also United States v. Hoffman*, 498 F.3d 879, 881 (7th Cir. 1974) (holding that private railroad police possessing the same powers as public police officers were state actors). *Cf. Screws v. United States*, 325 U.S. 91, 109-10 (1945) (observing that one has the power to arrest only when one is "clothed with the authority of state law") (citation omitted); *Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th Cir. 2003) (observing that "the police function is 'one of the most basic functions of government'" and "an arrest is 'the function most commonly associated with the police'") (quoting *Foley v. Connelie*, 435 U.S. 291, 297 (1978)).

Defendants contend that *Wade* ought to control here because, as in that case, private security police officers' power to make arrests is subject to spatial or geographic limits. *See* M.C.L § 338.1080. But the spatial or geographic limitation in *Wade* was profound – it prohibited housing authority security guards from exercising their (already minimal) powers anywhere except in the lobbies of buildings operated by the housing authority. *See Wade*, 83 F.3d at 906. By contrast,

---

[2]The dissent's repeated reliance on *City of Grand Rapids v. Impens*, 327 N.W.2d 278 (Mich. 1982), is misplaced. There, private security officers suspected the defendant and two others of shoplifting. *Id.* at 279. The officers *asked* the three individuals to come to the security office. *Id.* The officers searched the three and found merchandise on one of the other individuals. *Id.* The officers then elicited information from the defendant to complete a "Loss Prevention Department Voluntary Statement." *Id.* The officers read the statement to the defendant and asked the defendant to sign it, which he did. *Id.* "There was no indication that defendant would not be released if the statement were not signed." *Id.* Prior to his trial, the defendant moved to suppress the signed statement, arguing that it was obtained in violation of *Miranda*. *Id.* The Michigan Court held that the private security officers were not required to give *Miranda* warnings. *Id.* at 282.

One obvious distinction between the instant case and *Impens* is that *Impens* did not involve an arrest in any form. There, the defendant was not held against his will. He was asked to go to the security office; he was asked to sign a form. There was no indication of arrest.

The key distinction, however, is that the security officers did not exercise power exclusively reserved to the states. The contested conduct was the security officers' elicitation of the defendant's statements. Simply put, asking questions in a non-custodial setting is a power not within the exclusive province of the state.

[3]The dissent misinterprets this Court's language with respect to the phrase "plenary arrest power." We agree with the dissent that under Michigan law, a licensed private security officer has a power of arrest equivalent to that held by a public police officer only on the property of her employer and only during her work hours. The Court has never contended that M.C.L. § 338.1080 gives a private security officer the power to make warrantless arrests wherever and whenever she pleases.

Instead, a licensed private security officer's arrest power is plenary in the sense that while on her employer's property during her working hours, a private security officer can make warrantless arrests to the same extent as a public police officer. The instant case closely resembles *Henderson*, a case where the court found state action when the state delegated to university police officers a full power of arrest limited to campus property. 631 F.2d at 1118 (citing 71 Pa. Stat. Ann. § 646).

In contrast, the private security officers in *Wade* only had the power to "arrest people for criminal trespass . . . ." 83 F.3d at 906. As the Seventh Circuit later pointed out, the private security officers in *Wade* would have to "dial 911" if they witnessed a crime other than criminal trespass. *Payton*, 184 F.3d at 630. Under Michigan law, a private security officer has no such limitation.

§ 338.1080 invests private security police officers with full arrest authority on the entirety of their employer's premises, which makes this case distinguishable from *Wade* and similar to *Payton* and *Henderson*, each of which involved a statute or ordinance that imposed or contemplated some spatial or geographic limits on the private defendants' police powers. *See Payton*, 184 F.3d at 625 (special police officers "shall possess the powers of the regular police patrol *at the places for which they are respectively appointed*") (emphasis added) (citation omitted); *Henderson*, 631 F.2d at 1117-19 (authority of the university police was limited to the university campus in question). Furthermore, as we have discussed, private security police officers in Michigan are endowed with plenary arrest authority, *see* § 338.1080, while the defendant in *Wade* was permitted to exercise only what were in effect citizens' arrests. *Wade*, 83 F.3d at 906; *see also Payton*, 184 F.3d at 629-30.

Finally, we address Defendants' repeated representation that, although empowered to make arrests under § 338.1080, Brown and the other casino employees licensed under the statute are, as a matter of casino policy, not permitted to exercise this statutory authority to effectuate arrests. For this argument Defendants again rely on *Wade*, in which the very document that was the source of the defendant's police-type powers, his contract with the public housing authority, at the same time imposed profound limits on those powers. *See Wade*, 83 F.3d at 905-906. Here the source of Brown's power to make arrests is a statute that includes no qualitative limits on that power, so *Wade* is inapplicable. Defendants do not cite a case in which a private security officer licensed to make arrests as under § 338.1080 was held not to be a state actor on the ground that the officer's employer substantially circumscribed the arrest power conferred on the officer by having been licensed. The only arguable support we have found for Defendants' argument is the concurring opinion in *Payton*, in which Judge Ripple opined that while for pleading purposes the plaintiff's claim of state action was viable, it might ultimately fail because "[f]urther development of the record might well establish . . . that the guards' responsibilities were significantly circumscribed by their employer and that they performed well-defined functions quite narrow in scope . . . ." 184 F.3d at 634 (Ripple, J., concurring).

In this case, whatever development of the record occurred did not reveal circumscriptions of Brown's authority, let alone circumscriptions of the sort contemplated by Judge Ripple in *Payton*. Indeed, it is noteworthy that Defendants did not even make this argument at the summary judgment stage of the proceedings, arguing instead that while Brown and some of her colleagues *do* have the power to make arrests, Brown did not use it in this case. It is not surprising then, that in their brief to this Court, Defendants do not offer a single citation to the record in support of the contention that Brown's arrest authority was substantially circumscribed. Furthermore, the jury found that Defendants had in fact arrested Romanski and this aspect of the judgment is not on appeal (Defendants' jury instruction claim goes to whether probable cause existed, not whether an arrest occurred). Under these circumstances, we decline Defendants' invitation to look past § 338.1080's express grant of plenary arrest authority to private security police officers. We similarly find unpersuasive the representation made on appeal that Brown was not acting pursuant to her § 338.1080 authority when she initiated the unlawful arrest of Romanski, but rather was merely protecting the casino's self-interest – conduct, Defendants maintain, that was more in the nature exercising the shopkeeper's privilege. *See*, *e.g.*, *Chapman*, 319 F.3d at 833-34. Quite apart from the question whether Michigan's version of the shopkeeper's privilege even applies to casinos (see M.C.L. § 600.2917 and our discussion in the next section) there is no evidence in the record that could support the self-protection narrative Defendants urge us to adopt. Indeed, all of the evidence was to the contrary: Brown was employed by the casino as a private security police officer and was on duty in that capacity when she initiated the detention of Romanski.

Consistent with the Seventh Circuit's approach in *Wade* and *Payton*, we have focused on the specific powers that Brown, in her capacity as an on-duty and duly licensed private security police officer, had at her disposal. *See Payton*, 184 F.3d at 629-30; *Wade*, 83 F.3d at 905-906. Because at least one of these powers, the plenary arrest power, is "traditionally the exclusive prerogative of

the state," *Jackson v. Metropolitan Edison Co.*, 419 U.S. at 353, and because it is undisputed that Brown was in fact duly licensed under M.C.L. § 338.1079 and was in fact on duty at all times relevant to this case, the district court correctly held that Brown was a state actor as a matter of law.[4]

## B.        Jury Instructions

Defendants also contend that two of the district court's jury instructions were erroneous. We must "review jury instructions as a whole to determine if they adequately inform the jury of the relevant considerations and 'provide a basis in law for aiding the jury in reaching its decision.'" *Argentine v. United Steelworkers of America, AFL-CIO*, 287 F.3d 476, 484 (6th Cir. 2002) (quoting *Jones v. Consolidated Rail Corp.,* 800 F.2d 590, 592 (6th Cir.1986)). Accordingly, we will reverse a jury verdict on account of instructional error "only in situations where the instruction, viewed as a whole is 'confusing, misleading, and prejudicial.'" *Id.* (quoting *Barnes v. Owens-Corning Fiberglass Corp.,* 201 F.3d 815, 822 (6th Cir.2000)). Applying these standards, we find no error with respect to the two instructions at issue in this appeal.

The first instruction to which Defendants object related to whether they had probable cause to arrest Romanski. Defendants apparently argued that they had probable cause to believe Romanski had stolen the five cent token from the casino, i.e., that the token was not abandoned when Romanski took it into her possession. Although the district court did conclude at the summary judgment stage that there was a bona fide jury question as to whether the token was abandoned, it nevertheless observed "that there is no other likely explanation for the token being in the tray of the slot machine." 265 F. Supp. 2d at 845. The district court's statement is an apt reflection of the record, which contains not even a scintilla of evidence supporting Defendants' contention that the token was the casino's property rather than abandoned by a prior player at the slot machine. Nor did Defendants come forward with a basis in Michigan law for their assertion that the token became the casino's property once the prior player departed. The general rule, as noted by the district court, is that playing a slot machine is the commencement of an aleatory contract between the player and the casino. In the event the player wins a round, the casino "loses its legal right to the property, and the [player] gains that right." 265 F. Supp. 2d at 845 (citing Restatement (Second), Contracts § 232 cmt. c (1981)).

Against this backdrop, we cannot say the district court erred when it instructed the jury that:

> This case, as we all know, involves a token, a five cent token. The plaintiff as the finder of a lost or abandoned token, has superior title to that token than does the Motor City Casino. In determining whether the token was lost or abandoned, you are to use your common sense and consider whether there was any other rational circumstance for that token to be in that tray. The only person who has a superior right to that token other than the plaintiff, is the person who lost it or the person who abandoned it.

We must also note the patent insignificance of a five cent token. Assuming for the moment that Defendants genuinely suspected Romanski of theft (it appears from the record that the real motive for the poor treatment of Romanski may have been her "attitude"), Defendants' decision to

---

[4] We are aware that in contrast to the district court's conclusion below and our holding in this opinion, two other district courts in the Eastern District of Michigan have concluded in similar cases that private security police officers employed by the casino were not acting under color of state law. *Smith v. Detroit Entertainment L.L.C.*, 338 F. Supp. 2d 775 (E.D. Mich. 2004); *Lindsey, et al. v. Detroit Entertainment L.L.C.*, Slip. Op., No. 03-CV-71129 (E.D. Mich. Oct. 14, 2004) (unpublished). Both cases have been appealed to this Court and briefing was held in abeyance pending our decision in this case. We have reviewed the respective district courts' analysis of the state action question in those cases and, for the reasons stated in this opinion, do not find either opinion persuasive on that point.

deal with the situation by dispatching a team of security personnel – at least one of whom was in effect a police officer – to detain and interrogate Romanski offends the "venerable maxim *de minimis non curat lex* ('the law cares not for trifles')." *Wisconsin Dept. of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992) (citing cases). Under the circumstances of this case, the district court's instruction on abandonment was not confusing, misleading, or prejudicial. *See Argentine*, 287 F.3d at 484.

Defendants' second jury instruction claim relates to two instructions it proposed but the district court rejected. Defendants first requested the district court to instruct the jury that "[a] private business owner has the right to protect its business interests and property and may detain a patron suspected of theft." The district court declined to adopt this proposed instruction on the ground that the authority cited by Defendants in support of it related only to the common law shopkeeper's privilege to detain a patron suspected of theft – a privilege, the district court reasoned, that Michigan law does not extend to casinos.

This proposed instruction was not material to an issue in the case. The jury was instructed that Romanski's false arrest claim depended on proof that some legal justification (usually probable cause) for the detention was lacking, *see Lewis v. Farmer Jack Div.*, *Inc.*, 327 N.W.2d 893, 894 (Mich. 2003); and, similarly, that her § 1983 claim depended on proof that probable cause was lacking. The shopkeeper's right to detain suspected thieves, assuming for the moment that it applies to casinos, is a cognizable defense only where there is probable cause that a theft occurred. M.C.L. § 600.2917(1) (the codification of Michigan's shopkeeper privilege). Were it otherwise, shopkeepers who invoked the privilege would be insulated from liability for false arrest. In short, contrary to Defendants' requested instruction, neither shopkeepers nor casino proprietors enjoy an absolute privilege to detain patrons. It is clear, therefore, that the district court's instructions on probable cause and false arrest properly explained the crux of any self-protection privilege the casino might enjoy. To the extent that Defendants proposed the right-to-detain instruction in connection with the state action question, we have already held that in this case the casino employed Brown in her capacity as an on-duty private security police officer, not as a security guard charged merely with protecting the casino's property.

The second instruction sought by Defendants – an instruction to the effect that Michigan permits a casino to eject a patron for any reason it deems necessary – was likewise immaterial to the issues in the case; we have no trouble, therefore, concluding that the district court properly rejected it. The gravamen of Romanski's claim for relief is not that she was ejected but rather that she was arrested without probable cause, which is why she sued for false arrest and unlawful arrest, the latter under § 1983. Accordingly, Romanski's claim for relief goes principally to Defendants' treatment of her before she was ejected from the casino; and, it must be remembered, it is that conduct alone for which the jury held Defendants liable. We see no error in the district court's decision to reject this proposed instruction.

## C.          **Amount of the Punitive Damages Award**

The casino appeals the jury's assessment of $875,000 in punitive damages against it on the ground that the amount is unconstitutionally excessive. Whether a punitive damages award is so excessive as to offend due process depends on our assessment of the three "guideposts" first enunciated in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996): the degree of reprehensibility of the defendant's conduct, the punitive award's ratio to the compensatory award, and sanctions for comparable misconduct. *Id.* at 576-84. We conduct "*de novo* review of a trial court's application of [these guideposts] to the jury's award." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001)). As the Supreme Court recently said: "Exacting appellate review ensures that an

award of punitive damages is based upon an application of law, rather than a decisionmaker's caprice." *Id*. (internal quotation marks and citation omitted); *see Gore*, 517 U.S. at 436.

### 1.     Reprehensibility

The Supreme Court has said that "[t]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Campbell*, 538 U.S. at 419 (quoting *Gore*, 517 U.S. at 576). We must "determine the reprehensibility of a defendant" by considering whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id*. (citing *Gore*, 517 U.S. at 576-77). Merely because one of these factors is satisfied in a given case does not mean the punitive damages award is constitutionally unassailable; however, "the absence of all of them renders any award suspect." *Id*. In conducting our review of the punitive damages award, we must presume that a plaintiff's compensatory award made her whole for her injuries. *Id*. Consistent with the well-established purpose of punitive damages, *see Gore*, 517 U.S. at 568 (citing cases), such damages "should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Campbell*, 538 U.S. at 419.

In conducting its reprehensibility analysis, the district court concluded that the harm caused by the casino "was primarily physical, rather than economic." The basis for this conclusion was the fact that Romanski "testified that she felt sick, embarrassed, humiliated, intimidated and scared." Romanski's economic losses totaled $9.05, the combined value of the lunch ticket revoked by the casino ($9) and the five-cent token the casino seized. The remaining $270 of the compensatory award was to make Romanski whole for the emotional distress she suffered as a result of Defendants' conduct. We think the district court was generally correct to describe Romanski's harm as primarily physical in character. Although she did not suffer actual physical injury, the jury could reasonably infer from the peculiar circumstances of Romanski's detention and questioning – a process initiated on the casino floor in front of patrons by a team of four security personnel – that the threat of physical force was apparent. Indeed, there was testimony that Brown threatened Romanski and it is undisputed that Brown had handcuffs at her disposal; in addition, it appears undisputed, so far as we can discern, that Brown and perhaps another member of the security staff accused Romanski of theft. In sum, we agree with the Second Circuit's conclusion in a similar case that a defendant's conduct can be highly reprehensible without being actually violent. *See Lee v. Edwards*, 101 F.3d 805, 810 (2d Cir. 1996) (although the defendant police officer did not use force in maliciously prosecuting the plaintiff, the defendant's invocation of state power to deprive the plaintiff of his rights presented "an element of real and threatened force that could have aroused the jury").

More important than the harm Romanski suffered, that harm being of such a type that the label "physical" rather than "economic" befits it, is the fundamental nature of Defendants' conduct in this case. As we indicated at the outset, Defendants treated Romanski in an inexplicable and egregious way. Indeed, on this record a jury could reasonably infer that Brown acted with "intentional malice" and not "mere accident." *Campbell*, 538 U.S. at 419. This is not a case of mistaken identity, nor one in which a law enforcement officer reasonably misread the circumstances. Defendants admit that Romanski was targeted because she picked up a five cent token. Whether Brown subsequently detained Romanski on suspicion of theft or because Romanski's "attitude"

perturbed Brown, the crucial point for reprehensibility purposes is that the detention itself and the manner in which it was carried out – e.g., by a team of four security personnel surrounding Romanski – were so egregious in light of the circumstances that malice naturally comes to mind. What other motivation, a reasonable observer might ask, would cause Brown and her colleagues to detain and interrogate a 72-year-old woman in a windowless room over five cents? This is especially true in light of the jury's conclusion that Defendants lacked probable cause to arrest Romanski. *See Stamathis v. Flying J, Inc.*, 389 F.3d 429, 443 (4th Cir. 2004) ("[A]s to the reprehensibility of the act, we cannot ignore that the jury found that the defendants did not have probable cause."); *Williams v. Kaufman County*, 352 F.3d 994, 1015 (5th Cir. 2003) (observing that a strip search obviously conducted without probable cause evidenced "reckless indifference toward the constitutional rights of plaintiffs" and hence was strong evidence of reprehensibility). The fact that the Defendants *knew* that the casino's own patrons had not been provided with notice of the slot-walking prohibition only makes the Defendants' conduct more reprehensible.

But Defendants' remarkable abuse of power did not end there. It is undisputed that the casino revoked Romanski's lunch ticket and, having been ejected, she was not permitted to eat anywhere in the casino. In other words, the rather inhospitable outside (it was humid and over 90 degrees) was the 72-year-old Romanski's only choice for lunch. It is further undisputed that Defendants refused to allow Romanski to enter the restroom by herself; instead, Defendants callously forced her to endure the indignity of having Brown stand guard outside the stall. This is without question evidence of malice and of a conscious disregard for Romanski's well-being and hence is probative of reprehensibility. *Cf. Gore*, 517 U.S. at 556; *Campbell*, 538 U.S. at 419. Finally, we must note one facet of the casino's behavior that is particularly deserving of condemnation and further indicative of malice, namely, that it dispatched someone who was in effect a police officer, with all the authority that that implies. Apparently, the casino was not content to have an ordinary security guard – one without the power to make arrests – simply inform Romanski of the purported slot-walking policy and leave it at that. There is, consequently, a troubling element of gratuitousness in Defendants' conduct.

In closing our discussion of reprehensibility, we find it appropriate to quote the district court again, this time from its opinion denying Defendants' motion for a new trial or a remittitur: "[T]his case was not about the loss of a five-cent token or a nine-dollar meal ticket; it was about [Romanski's] right not to be unreasonably seized [and] unreasonably detained . . . . Defendants acted with at least indifference to the health or safety of [Romanski], an elderly woman. After Defendant Brown observed [Romanski] play the five-cent token, [Romanski] was surrounded by four security guards, led up to the security office, informed she had committed a crime, photographed, and reported to the state police . . . . [T]he Court finds the conduct of Defendant MotorCity's employees to be particularly reprehensible."

In sum, while there is no evidence of similar misconduct in the past on the casino's part, *see Gore*, 517 U.S. at 576-77; *Campbell*, 538 U.S. at 422-23, it is clear in this case that the reprehensibility guidepost weighs in favor of a substantial punitive damages award.

### 2.       Ratio

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Gore*, 517 U.S. at 580 (citations omitted). When considered against the broad spectrum of civil cases, the ratio in this case (3,135 to 1) is unusually high and the compensatory damages award is unusually low. *Compare Gore*, 517 U.S. at 580-81 (rejecting a 500-to-1 ratio where the compensatory award was $4000); *Campbell*, 538 U.S. at 425-26 (rejecting a 145-to-1 ratio where the compensatory award was $1 million). But this is a § 1983 case in which the basis for the punitive damages award was the plaintiff's unlawful arrest and the plaintiff's economic injury was so minimal as to be essentially

nominal.  The Supreme Court's cases on the ratio component of the excessiveness inquiry – which involved substantial compensatory damages awards for economic and measurable noneconomic harm[5] – are therefore of limited relevance.  *See Lee*, 101 F.3d at 810-12.

This Court and other courts have recognized that where "injuries are without a  ready monetary value," such as invasions of constitutional rights unaccompanied by physical injury or other compensable harm, higher ratios between the compensatory or nominal award and the punitive award are to be expected.  *Argentine v. United Steel Workers of Am., AFL-CIO, CLC*, 287 F.3d 476, 488 (6th Cir. 2002) (sustaining a 42.5 to 1 ratio, and thus a $400,000 punitive award, where injury was a national union's sustained campaign of retaliation against a local branch because some of its members expressed disagreement with a union-promoted bargaining agreement); *see also Dean v. Olibas*, 129 F.3d 1001, 1007 (8th Cir. 1997) (sustaining a 14 to 1 ratio, and thus a $70,000 punitive award, where the unlawful arrest of the plaintiff caused him primarily a kind of harm not measurable in monetary terms).  Indeed, the Second Circuit has reasoned, we think correctly, that in cases where the compensatory award is very low or nominal, "*any* appreciable exemplary award would produce a ratio that would appear excessive by this measure." *Lee*, 101 F.3d at 811; *see also Fabri v. United Technologies Intern., Inc*., 387 F.3d 109, 126 (2d Cir. 2004); *Disorbo v. Hoy*, 343 F.3d 172, 187 (2d Cir. 2003).  The Fifth Circuit also adheres to this uncontroversial view.  *See Williams*, 352 F.3d at 1016.

These decisions in the circuits are based as much on intuition as on the only plausible interpretation of crucial dicta in *Gore* and *Campbell*; to wit, as the Court said in the first of those cases: "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages.  A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Gore*, 517 U.S. at 582.  Read in conjunction with the Court's consistent "rejection of a categorical approach" to evaluating the constitutionality of punitive damages awards,  *id*.; *Campbell*, 538 U.S. at 425, these pronouncements about the effect, in appropriate cases, of a low or nominal compensatory award on the excessiveness inquiry are weighty indeed. *See*, *e.g*., *Argentine*, 287 F.3d at 488; *Lee*, 101 F.3d at 811.

Consistent with these principles, we think that to determine whether the punitive award in this case is within constitutional limits, the best approach is to compare it to punitive awards examined by courts "in other civil rights cases to find limits and proportions." *Lee*, 101 F.3d at 811; *see also Disorbo*, 343 F.3d at 189; *Williams*, 352 F.3d at 1016 n.78.  This approach is necessarily unscientific but aids us in identifying a ballpark within which to evaluate the $875,000 award at issue here.

We know of only one prior case in which we considered the constitutionality of a punitive damages award assessed pursuant to a finding of liability under § 1983.  The case, *Gregory v. Shelby County*, is quite distinguishable, however, because the plaintiff "suffered severe physical abuse, endured long hours of conscious pain and suffering, and ultimately died as a result [of a police officer's] actions."  220 F.3d 433, 445 (6th Cir. 2000)*.*  Furthermore, the compensatory award in *Gregory* was $778,000, so the $2.2 million punitive award easily satisfied *Gore*'s ratio guidepost. *Id*.  We turn, then, to other courts' treatment of punitive awards in civil rights cases.

In *Lee v. Edwards*, the plaintiff was awarded nominal compensatory damages and the Second Circuit concluded that the malicious prosecution verdict against the defendant, a police officer,

---

**5** *See Gore*, 517 U.S. at 565 (a $4000 compensatory damages award for depreciation to a car's value due to an undisclosed re-painting performed by the manufacturer); *Campbell*, 538 U.S. at 415 (a $1 million compensatory damages award for economic harm and emotional distress).

would support a punitive damages award of no more than $75,000; the jury had awarded $200,000. 101 F.3d at 813. The basis for the court's conclusion was that it had closely scrutinized but ultimately approved awards of substantially less than $200,000 in cases where the plaintiffs suffered "numerous and severe physical and psychological harms." *Id*. The defendant's conduct in *Lee*, not having caused the plaintiff such acute trauma, was not "remotely" as reprehensible. *Id*. In the later case of *Disorbo v. Hoy*, the Second Circuit remitted a punitive damages award of $1.275 million to $75,000; the claims were excessive force and abuse of process. It was clear in *Disorbo* that the plaintiff was severely beaten by the defendant police officer – the Second Circuit described the case as involving "heinous acts of police aggression" – who arrested her and her sister because she resisted his advances. 343 F.3d at 188-89.

In *Dean v. Olibas*, the Eighth Circuit sustained a $70,000 punitive award against a bail bondsman after the jury found him liable for causing the police to wrongfully arrest and book the plaintiff. 129 F.3d at 1007-1008. A key component of the *Dean* court's rationale was its concern that, as a bail bondsman, the defendant might "have other opportunities to knowingly initiate the arrest of innocent people" and cause them to suffer the indignity of detention in jail and prosecution. *Id*. Finally, in *Williams v. Kaufman County*, the Fifth Circuit sustained a $15,000 per-plaintiff punitive award against a police officer for having conducted illegal strip searches of the plaintiffs. 352 F.3d at 1016. The award satisfied *Gore* scrutiny, the court concluded, because it was "not unreasonable in light of the violations that took place" and in light of awards in similar cases. *Id*.

Our decision in *Gregory* and our review of these cases from other circuits leads us to two important conclusions: First, substantial punitive awards in § 1983 cases, not surprisingly, tend to accompany conduct that results in physical or psychological harm. Second, in the typical § 1983 case in which punitive damages are awarded, the defendant is an individual police officer, not the police department or municipality (which, odds are, have deeper pockets than the officer), let alone a deeply pocketed company, which the casino indisputably is. We have not found a case in which punitive damages were awarded based exclusively on a finding that the defendant unlawfully arrested the plaintiff and the award was challenged as unconstitutionally excessive. In addition, while we have said that the unlawful arrest of Romanski and the manner in which Defendants treated her are sufficiently reprehensible to warrant a substantial punitive damages award, the harm that befell Romanski is not as severe as the harm suffered by the plaintiffs in the cases just discussed (e.g., being severely beaten, strip-searched, or subjected to booking, jailhouse detention, and wrongful prosecution).

Nevertheless, a wrinkle peculiar to this case may render appropriate an award that exceeds the average punitive award for civil rights cases involving verdicts of this type. The defendant here is a casino, which, at the time of the verdict, yielded a daily intake of nearly $1,000,000. "Since a fixed dollar award will punish a poor person more than a wealthy one, one can understand the relevance of [the defendant's financial position] to the State's interest in retribution . . . ." *Gore*, 517 U.S. at 591 (Breyer, J., concurring); *see TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 462 & n.28 (1993) (plurality opinion); *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21-22 (1991). The defendant's financial position is equally relevant to the State's interest in deterrence, which is also a valid purpose of punitive damages. *Haslip*, 499 U.S. at 21-22; *Lee*, 101 F.3d at 813 (citation omitted).

At the same time, a defendant's wealth could heighten the likelihood of juror caprice. Thus the Supreme Court recently reiterated that "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." *Campbell*, 538 U.S. at 427 (citation omitted). Common sense gives us an additional reason to view skeptically the generic proposition that a high punitive award is necessary because of the wealth of the defendant. The Supreme Court said in *Gore* that "[t]he sanction imposed in this case cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve

that goal." 517 U.S. at 584. The upshot is two-fold: we must take into account the casino's wealth to ensure that the punitive damages award will further the interests it is designed to advance; but we must also ensure that our exacting appellate review results in an award that is not significantly higher than is necessary to further those interests.

Before proceeding to the third *Gore* guidepost, we take a final stab at putting the $875,000 punitive damages award in context. *See Lee*, 101 F.3d at 811. We have reviewed one roughly analogous case in which a state court examined a substantial punitive award levied against a corporate defendant for conduct roughly similar to what occurred here. In that case, the plaintiff, a pregnant woman shopping on Christmas eve with her two children, brought a malicious prosecution claim against Wal-Mart after she was wrongly accused of shoplifting a telephone, detained briefly at the store, arrested by the police, charged for theft, jailed, and tried, all at Wal-Mart's behest. *Wal-Mart Stores, Inc. v. Goodman*, 789 So.2d 166, 171 (Ala. 2000). A jury awarded the plaintiff $200,000 in compensatory damages for mental anguish and $3 million in punitive damages, the latter because it was clear that Wal-Mart could have taken steps that would have quickly exonerated the plaintiff. *Id*. at 173. The Supreme Court of Alabama concluded that *Gore* permitted a punitive-compensatory ratio of no greater than 3-to-1 on the ground that Wal-Mart's conduct, although it was reprehensible, did not cause the plaintiff physical injury. *Id*. at 181. Accordingly, the post-remittitur punitive award was $600,000. The *Goodman* case is not directly on-point – it involved conduct of a different character than that which occurred here and a substantial compensatory award – but it nevertheless assists us in completing the backdrop against which to evaluate the size of the punitive damages award assessed against the casino.

### 3.        Sanctions for Comparable Conduct

"Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." *Gore*, 517 U.S. at 583. The purpose of this guidepost reflects an elementary principle of due process – namely, that the defendant must have been provided "fair notice" that its conduct would subject it to a penalty on the order of the punitive damages award. *Id*. at 584; *Campbell*, 538 U.S. at 428. Notice of possible penalties is not to be confused with notice of the unlawfulness of the underlying conduct; the latter is irrelevant to the constitutionality of a punitive damages award. *Gore*, 517 U.S. at 580; *Disorbo*, 343 F.3d at 186; *Lee*, 101 F.3d at 809.

We have already canvassed the most comparable cases we have found; indeed, this case is an occasion where the ratio and comparable conduct guideposts substantially overlap. Still, the question here is not whether similar punitive awards for similar conduct were held constitutional in prior cases but whether the casino had fair notice that conduct of the sort that occurred here might result in penalties, fines, or punitive damages on the order of $875,000. *See Campbell*, 538 U.S. at 428; *Gore*, 517 U.S. at 584. The parties do not address whether Defendants' conduct might have implicated any Michigan civil or criminal penalties such that Defendants would have been on notice of specific penalties. We note that the district court concluded that the unlawful arrest of Romanski would not have subjected Brown or the casino to any specific statutory civil or criminal penalties. We take no issue with this account in light of the parties' silence on the question.

In a general sense, of course, the casino had fair notice that a verdict against a state actor for violating someone's constitutional rights might result in a punitive damages award if the conduct is sufficiently egregious. *See Smith v. Wade*, 461 U.S. 30, 56 (1983). The civil rights cases we canvassed, therefore, provided some notice as to potential punitive damages awards for § 1983 liability. Accordingly, we conclude the casino had fair notice that it might face punitive damages for sanctioning the type of civil rights violation that Romanski endured here but it did not have notice that an award as high as $875,000 was likely. *See Campbell*, 538 U.S. at 428; *Gore*, 517 U.S. at 584. This guidepost militates in favor of reducing the award.

### 4.        Conclusion

The lasting impression this case leaves is one of egregious misconduct – a *de jure* police officer's gratuitous abuse of power, sanctioned by a casino, that left a 72-year-old woman the victim of needless indignities and humiliation.  In moral terms, the casino's conduct was significantly reprehensible; it surely was reprehensible enough to warrant a substantial punitive damages award.  In comparative terms, however, because Romanski was not beaten, charged or tried, the conduct here was not as reprehensible as the defendants' conduct in some of the civil rights cases we have canvassed.  In addition, the casino did not have fair notice that a verdict for unlawful arrest – unaccompanied by a verdict for assault, excessive force, or malicious prosecution, or proof of physical injury or sustained psychological trauma – would result in a penalty on the order of $875,000.

However, we must consider the *Gore* guideposts in their totality and, furthermore, we must ensure that a punitive damages award actually achieves the twin purposes of punishment and deterrence.  As the Second Circuit aptly put it in *Lee*: "In gauging excessiveness, we must keep in mind the purpose of punitive damages: 'to punish the defendant and to deter him and others from similar conduct in the future.'" 101 F.3d at 809 (citing *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992)); *see also Gore*, 517 U.S. at 568; *Haslip*, 499 U.S. at 21-22.  Furthermore, "deterrence is directly related to what people can afford to pay." *Lee*, 101 F.3d at 813 (citation omitted); *see also Gore*, 517 U.S. at 591 (Breyer, J., concurring).  Consequently, it was entirely appropriate for the jury to craft a punitive damages award that was sensitive to the casino's financial position.  And we too must be sensitive to this reality in reviewing the award.

Under the totality of the circumstances, mindful that the Supreme Court has charged us with "considering whether less drastic remedies [than the jury's punitive damages award] could be expected to achieve" the State's goal of deterring future misconduct, *Gore*, 517 U.S. at 585, *and* with ensuring that punishment and deterrence are achieved, we think an award of no greater than $600,000 – sixty per cent of the casino's daily intake at the time of the verdict – would satisfy the demands of the due process clause.  It cannot be seriously contended that this is an insignificant amount for the casino.[6]  Moreover, a $600,000 award is comfortably within the ballpark of the punitive damages awards in the civil rights cases we have canvassed, *see esp. Goodman*, 789 So.2d at 171 (involving a corporate defendant); the less reprehensible conduct in this case being counteracted by the need to make the award large enough to actually punish and deter, something that is ordinarily not a challenge in civil rights cases.

Accordingly, on remand, the district court must give Romanski the option of agreeing to remit $275,000 and to accept a $600,000 punitive damages award or to proceed with a new trial on the issue of damages.  *See Meyers v. Wal-Mart Stores*, *Inc*., 257 F.3d 625, 636 (6th Cir. 2001); *Farber v. Massillon Bd. of Educ*., 917 F.2d 1391, 1396 (6th Cir. 1990); *Brewer v. Uniroyal*, *Inc*., 498 F.2d 973, 976 (6th Cir. 1974); *Disorbo*, 343 F.3d at 189; *Lee*, 101 F.3d at 813.

### III.  CONCLUSION

We **VACATE** the punitive damages portion of the district court's judgment, **AFFIRM** the judgment in all other respects, and **REMAND** for proceedings consistent with this opinion.

---

[6] We note that neither Romanski nor the district court considered *Gore*'s requirement that less drastic measures must be evaluated to ensure that the ultimate penalty imposed comports with due process.

-----------------

**DISSENT**

-----------------

FARRIS, Circuit Judge, dissenting. The Michigan statute upon which the majority relies places specific limitations on private security guards that distinguish their powers of detention from those of public peace-officers. *See* M.C.L. § 338.1080. Although security guards can make arrests without a warrant, M.C.L. § 338.1080 emphasizes that their authority is limited by the bounds of their *private employment*: They can only detain individuals on company property, during their hours of employment, while wearing a company uniform.[1]

The Michigan Supreme Court has specifically rejected the majority's conclusion that licensed, private security guards are necessarily state actors. (Op. 13.)

> [D]efendant believes that the licensing statutes which regulate private security guards demonstrate the requisite degree of state action to bring their activities under color of state law, subject to constitutional restraints. We disagree. We do not believe that the mere licensing of security guards constitutes sufficient government involvement to require the giving of *Miranda* warnings. *City of Grand Rapids v. Impens*, 327 N.W.2d 278, 281 (Mich. 1982).

By its own account, in granting licenses to private security guards, the State of Michigan has not attempted to, "cloak[] private individuals with virtually the same power as public officers." *See Payton*, 184 F.3d at 629. But even if the casino's private security guards did hold plenary arrest authority under Michigan law, it would still be necessary to establish that they actually exercised this authority during the detention of Romanski.

In applying the public interest test, it is the exercise, and not the possession, of powers belonging exclusively to the state that determines whether the action was under color of state law. *See Chapman v. Higbee Co.*, 319 F.3d 825, 834 (6th Cir. 2003) (en banc) ("Under the public function test, a private party is deemed a state actor if he or she exercised powers traditionally reserved exclusively to the state.")*; Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 302-03 (2001) (holding that actions can only be attributed to the state if they were "exclusively and traditionally" public); *see also Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158

-----------------

[1] The majority relies on the holdings in *Payton v. Rush-Presbyterian* and *Henderson v. Fisher* for the proposition that the geographical limitations on security guards' authority in M.C.L. § 338.1080 do not alter the "plenary" nature of their power. (Op. 14.) Those cases are distinguishable from this case. The Chicago ordinance cited in *Payton* states that private officers "possess the powers of the regular police patrol at the places for which they are respectively appointed or in the line of duty for which they are engaged." *Payton v. Rush-Presbyterian*, 184 F.3d 623, 625 (7th Cir. 1999). Unlike the Michigan statute, the Chicago ordinance grants special police officers broad police powers without specific geographical limitations. Moreover, the ordinance also forces special police officers to comply with all rules and regulations governing public officers and requires them to report directly to the superintendent of police. *Id.* Likewise, *Henderson v. Fisher* also differs significantly from this case. In *Henderson* the court held that the University of Pittsburgh, where the campus police worked, was essentially a state institution. *Henderson v. Fisher*, 631 F.2d 1115, 1118 (3d Cir. 1980) ("[T]he University of Pittsburgh has lost its wholly private charter and has become an instrumentality of the Commonwealth . . . ."). Furthermore, the Pennsylvania statute cited in *Henderson* extends the authority of campus officers beyond the bounds of state universities, permitting them to "exercise those powers . . . conferred pursuant to this section within the municipality for the limited purpose of aiding local authorities in emergency situations." 71 Pa. Stat. Ann. § 646 (2005). Due to M.C.L. § 338.1080's comparative limitations on the authority of private security guards, I believe this case is more akin to *Wade v. Byles*, than either *Payton* or *Henderson*. *See Wade v. Byles*, 83 F.3d 902, 904 (7th Cir. 1996) (finding an absence of state action where guards were not allowed to pursue individuals outside the lobby of city housing authority buildings).

(1978) ("[V]ery few [functions] have been 'exclusively reserved to the State.'" (citation omitted)).**2** Romanski has presented no evidence that the State of Michigan has traditionally and exclusively reserved the power to make warrantless arrests. To the contrary, the Michigan Supreme Court has held that licensed private security guards do not act as state actors in detaining shoplifting suspects. *Impens*, 327 N.W.2d at 281. ("Their [guards'] role may be viewed as an extension of the shopkeepers' privilege to detain for a reasonable period of time a person suspected of theft or failure to pay.").

Viewing the facts in the light most favorable to defendants, I am not convinced that the casino security guards acted under color of state law in detaining Romanski. The four security guards approached and then later escorted Romanski off-the-floor because they believed she had committed a crime and, as the guards contend, she had become loud and belligerent when they attempted to explain the casino's policy against "slot-walking." Even Romanski concedes that Brown detained her, not simply because of her attitude, but because she suspected Romanski of theft. (Op. 3.) The law on this point is very clear: Investigation of a possible crime on an employer's premises "does not transform the actions of a private security officer into state action." *Chapman*, 19 F.3d at 834. That the "crime" was a "trifle," as the opinion notes, and that the guard's actions may have constituted an egregious tort, is irrelevant.

As in *Chapman*, where a security guard conducted an unauthorized strip search of a female customer, the behavior of the casino security guards in this case was outrageous and abusive, but it was clearly meant to serve the interests of the employer. *Id.* The humiliating detention of Romanski was based solely on the enforcement of an inane casino policy and ultimately involved collection of personal data to prevent her from returning to the casino for six months. However, the security guards neither threatened nor actually invoked the authority of the state during the incident.**3**

Because the actions of the casino's security guards failed to constitute state action, I would dismiss Romanski's § 1983 claim. In the absence of subject-matter jurisdiction, I would remand her case to the district court with directions to vacate and remand to state court.

I respectfully dissent.

---

**2** While the Supreme Court has held that certain actions may be public even if they could have been undertaken in a private capacity, *see Griffin v. Maryland*, 378 U.S. 130, 135 (1964); *West v. Atkins*, 487 U.S. 42, 56 n.15 (1988), these instances involve preventing a state from avoiding a constitutional duty by delegation, *see Georgia v. McCollum*, 505 U.S. 42, 53 (1992); *Wade*, 83 F.3d at 906, or an actor with parallel roles "purporting to act" in the state role, *see Flagg Bros*, 436 U.S. at 163 n.14.

**3** As the majority notes, the Michigan State Police were notified regarding Romanski's ejection. (Op. 5.)