IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 14, 2020 Session

**STATE OF TENNESSEE v. TOMMY CHARLES SIMPSON, JR.**

**Appeal from the Criminal Court for Davidson County**
**No. 2015-A-444      Cheryl A. Blackburn, Judge**

—————————————————

**No. M2019-01222-CCA-R3-CD**

—————————————————

Pursuant to a plea agreement, Tommy Charles Simpson, Jr., Defendant, pled guilty to one count of sexual exploitation of a minor reserving a certified question for appeal in which he asserts that the trial court erred in denying his motion to suppress. Defendant argues that a state-licensed private security guard's seizure of Defendant's cell phone constituted "state action," violating his Fourth Amendment rights. Following a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and TIMOTHY L. EASTER, JJ., joined.

Jim Todd (at trial) and Mark C. Scruggs (at trial and on appeal), Nashville, Tennessee, for the appellant, Tommy Charles Simpson, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Jeremy D. Johnston, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

*Motion to Suppress Hearing*

Defendant moved to suppress the evidence found on his cell phone, and the trial court held a suppression hearing. Defendant testified that he owned an iPhone 4s, and on September 18, 2014, he left his phone at Bikini Beach Bar. Defendant explained that the phone's screen would turn to black to save the battery if it was not in use. His common

practice was to set his phone to automatically lock after five idle minutes. Defendant's phone would then require a password to be accessed.

Defendant testified that he noticed his phone was missing within fifteen minutes of leaving Bikini Beach Bar when he was at another nearby sports bar. Defendant then began to search for his phone, looking around the sports bar and in his car. He returned to Bikini Beach Bar within thirty minutes of leaving and arrived there at approximately 11:00 p.m.

On cross-examination, Defendant explained that, when he returned to Bikini Beach Bar, he asked the bartender if anyone had found a phone. The bartender told Defendant that, as far as he knew, no phone had been found and recommended that Defendant check the bathroom. Defendant looked around the area where he had been sitting and in the bathroom but did not locate his phone. Defendant said that he never saw anyone search his phone and that he never saw the security guard, Vladimir Gojkovic, after he returned to Bikini Beach Bar. When asked about where he was sitting while at the bar, Defendant said that he normally sat at the bar area. Defendant also said that he usually used his phone to text while at the bar. Defendant did not remember whether he was using his phone while at the bar, but he did recall the phone being out of his pocket. Defendant stated that he normally kept his phone in his pocket when he was not using it.

When he did not find his phone at Bikini Beach Bar, Defendant went home and checked his phone's location via the "Find My iPhone" app. Because the two bars were almost adjacent to one another, Defendant stated that "it was almost impossible to tell" whether the phone was at Bikini Beach Bar or the other sports bar. "Find My iPhone" showed that Defendant's phone was on Antioch Pike, but Defendant said that it was hard to discern the specific address where the phone was located.

After seeing the general location of his phone on "Find My iPhone," Defendant went back to the other sports bar to search for his phone. He searched the entire bar but could not find it. Defendant then asked the security guard to borrow his phone to call the police, but the security guard refused.

Defendant said that he then proceeded to a gas station to call the police non-emergency number. Defendant said that he asked the police to meet him at the sports bar to take a report on his missing phone. Defendant estimated he placed this call around 11:45 p.m. Defendant said that a police officer never came, so he had to stop a police officer driving on Antioch Pike to take a report. Defendant estimated that he made the report to this police officer around 3:00 a.m.

On redirect, Defendant stated that he called the police at the gas station around 1:00 a.m. Defendant explained that the officer he stopped had a K-9 with him and was unable to take Defendant's report. Defendant testified that the K-9 officer used his radio to ask another officer to take the report; this officer arrived about fifteen minutes later and took Defendant's report.

Detective Robert Carrigan of the Metropolitan Nashville Police Department ("MNPD") was called as a witness by Defendant. He testified that he became involved in the case after Defendant's phone was turned over to police. Detective Carrigan authenticated a report that he had written explaining that a "cell phone was turned in as found property under complaint 14-08870752." Detective Carrigan said that he believed a patrol officer turned in Defendant's phone as found property and not as evidence of a crime.

On cross-examination by the State, Detective Carrigan was asked if he had viewed the contents on Defendant's phone. He said that he had and that the phone contained over one hundred sexual images of minors. Detective Carrigan explained that most of the pictures were of children "posed in sexual positions where the focus of the image was the genitalia, the breasts, or the buttocks." Detective Carrigan said that he was able to confirm that Defendant was the phone's owner.

On redirect, Detective Carrigan said that he contacted Mr. Gojkovic. Mr. Gojkovic said that he found Defendant's phone and called police to turn it over. Mr. Gojkovic requested that an officer meet him at Waffle House. The responding patrol officer met Mr. Gojkovic and retrieved the phone. Detective Carrigan said that he was not sure whether the patrol officer viewed the pictures on Defendant's phone. The patrol officer then notified Detective Chuck Fleming of the situation, and Detective Fleming turned in the phone, thinking it may contain evidence of a crime.

Detective Carrigan asked Mr. Gojkovic to give a specific description of the images he saw on Defendant's phone. Based on Mr. Gojkovic's description of the phone's contents, Detective Carrigan obtained a search warrant for Defendant's phone. Then, based on what he found on Defendant's phone, Detective Carrigan obtained a warrant to search Defendant's residence for additional evidence.

The trial court denied the motion to suppress in a written order dated September 18, 2017. Defendant filed a timely motion for permission to appeal.

*Motion to Reopen and Motion to Supplement Proof Hearing*

Defendant filed a motion to reopen proof on his motion to suppress and later filed a motion to supplement proof with additional evidence. On May 1, 2018, the trial court heard evidence for both motions.

Christy Slate, manager and co-owner of Bikini Beach Bar, testified that Mr. Gojkovic was a licensed security guard for the bar. Ms. Slate stated that Mr. Gojkovic was the primary person responsible for maintaining order at the bar in September 2014. Ms. Slate acknowledged that Mr. Gojkovic was working on the night of September 18, 2014.

On cross-examination, Ms. Slate said that Mr. Gojkovic was an independent contractor and that the bar paid him directly. Ms. Slate said that not all of the security guards who had worked at the bar were licensed security guards like Mr. Gojkovic. Ms. Slate explained that the security guards did not have formal training. Instead, the bar's security guards received mostly on-the-job training.

Ms. Slate said that Steve Manter was in charge of scheduling the security guards. She agreed that Mr. Manter trained Mr. Gojkovic. She said that Mr. Manter had been working as a security guard during that time but that Mr. Manter had since passed away. Ms. Slate estimated that five other security guards were working in September 2014, but Mr. Gojkovic and Mr. Manter were the only licensed security guards working at that time. Ms. Slate agreed that it was not the security guards' job to arrest people or investigate for the police. Ms. Slate agreed it was unusual for the bar to involve the police in any security situations.

Ms. Slate explained that the security guards worked as "bar backs," where they would stock alcohol, take out the trash, and clean tables. Ms. Slate said that the security guards did not have badges, handcuffs, or firearms, but they wore red t-shirts identifying them as security. She would allow the security guards to play pool if there were five or fewer patrons in the bar.

Ms. Slate described the bar's lost item policy as "informal." Ms. Slate explained that, if a lost item was not cumbersome, then it would stay by the cash register or at the bar. However, if it was a more cumbersome item, like a helmet or leather jacket, then the lost item would likely be placed in her office. Ms. Slate agreed that it was common practice at the bar for any employee, whether security or not, to open a lost phone to identify the owner.

Ms. Slate stated that she was not at the bar on the night the incident took place. However, she spoke with Mr. Gojkovic about what happened that night. Ms. Slate said that Mr. Gojkovic told her that he found a phone and tried to find the owner. Ms. Slate said that, when Mr. Gojkovic pressed the phone's home button, explicit images were already pulled up. As a result, Mr. Gojkovic decided to call the police. Ms. Slate clarified that Mr. Gojkovic said it was his intention to identify the phone's owner, not to aid the police in an investigation.

Ms. Slate said that Mr. Gojkovic was not working for a government agency at the time he was working for Bikini Beach Bar. After Mr. Gojkovic's employment at the bar concluded, he joined the military.

On redirect, Ms. Slate estimated that around forty-six to forty-seven percent of the bar's gross revenue was from alcohol sales. She stated that she had managed the bar for twenty-one years and that the bar had never hired a MNPD officer as a security guard since she had managed the bar. Ms. Slate did not think that Mr. Gojkovic ever carried a weapon on the bar's premises even though Mr. Gojkovic had an armed security guard license. Ms. Slate said that she did not have a weapon on the bar's premises. The bar had a panic button that could be pressed to call the police, but it had only been pressed twice, both times accidentally. Ms. Slate agreed that she was not familiar with the training Mr. Gojkovic received to obtain his armed security guard license.

Ms. Slate stated that the bar's security would have pressed the panic button if there was a need to do so but that there was never a need. Ms. Slate explained that, if the bar needed assistance with security, an employee would call the police.

Jason Clarence ("J.C.") Shegog testified as an expert in the field of training private security guards. Mr. Shegog explained that a licensed armed security guard has access to a firearm, including handguns and shotguns. Mr. Shegog also explained that, to become a licensed security guard, the State required an application and a "fingerprinted background check[.]" Mr. Shegog stated that licensed security guard training included learning how to respond to emergency situations, render basic first aid, contain unruly people, use force, make official detainments or arrests, deploy a firearm, and stay safe in threatening environments. Further, these applicants learned about people's constitutional rights:

> I tell them that if [they] are making an arrest, then [they] can search that person for weapons and contraband with the incident to the arrest. As far as locating items that [they] do not know who the item belongs to or what's in those particular items, then [they hand] those over to management.

Mr. Shegog said that he had also trained law enforcement officers regarding the deployment of firearms, defense tactics, special weapons and tactics, the use of force, and searches.

Mr. Shegog stated that he had continuous contact with the MNPD and private security since 2004. Mr. Shegog said that he had knowledge of the MNPD's "twenty percent rule," which prohibited MNPD officers from taking secondary employment as private security in establishments that derive twenty percent or more of its revenue from the sale of alcohol. Mr. Shegog acknowledged that this policy was also in effect in September 2014. Mr. Shegog said that the private security guards were trained in the same way law enforcement officers are trained regarding use of force, searches, and seizures.

On cross-examination, Mr. Shegog explained that the State provided him with updates regarding any changes to the law governing security guards. Mr. Shegog stated that he was familiar with the Tennessee statutes governing what security guards could and could not do. Mr. Shegog agreed that Tennessee law prevented security guards from participating in several actions that police officers could do. Mr. Shegog agreed that security guards could not wear uniforms that resemble police uniforms unless the uniforms clearly identified them as security guards, could not advertise that they were agents of the State, could not represent to people that they were police officers, could not use vehicles or anything else that belonged to the State, and could not conduct arrests in the same way as police officers. Mr. Shegog said that security guards could not arrest someone for a felony but that they could detain someone for a felony that occurred on the premises, even if they did not witness the felony taking place but only learned of the crime based on hearsay. Mr. Shegog further explained that, if a security guard saw someone committing a crime on the premises, a security guard could conduct a citizen's arrest.

Mr. Shegog said he taught security guards that the liability of a security guard conducting an arrest was different than the liability of a police officer conducting an arrest. In particular, Mr. Shegog agreed that a police officer who conducted an unlawful arrest had more immunity than a security guard who conducted an unlawful arrest.

Mr. Shegog stated that he was familiar with Tennessee Attorney General Opinion Number 03-148, which stated that a security guard had the same authority as a private citizen to conduct a citizen's arrest. Mr. Shegog also stated that he was familiar with Tennessee Attorney General Opinion Number 04-006, stating that a security guard, whether armed or unarmed, had the right to stop a person for questioning on the property he or she was hired to protect "only within the scope of the suspect's consent unless the

security officer ha[d] placed the suspect under arrest." Mr. Shegog agreed this standard was different from the standard governing police officers' arresting power.

Mr. Shegog agreed that police officers could take out search warrants, arrest based on hearsay evidence, receive public funds to conduct investigations, and use police cars and precincts, none of which private security guards had the authority to do. Mr. Shegog also said that police officers had broader ability to use police power. Mr. Shegog said that he educated security guards on the differences between the authority of police officers and that of security guards under the constitution, including the power to conduct arrests and use force. Mr. Shegog agreed that police officers, compared to security guards, had broader authority under the constitution.

On redirect, Mr. Shegog read from Tennessee Attorney General Opinion Number 04-006:

A security [guard] on private property may stop a suspect for questioning, but the suspect may not be detained against his or her will. The Tennessee Code specifically authorizes security guards to prevent, observe and detect any unauthorized activity on private property, including intrusion, unauthorized entries, larcenies, vandalism, abuses, fires and trespasses. *See* Tennessee Code [Annotated section] 62-35-102(16)(C) (2003). Security guards are also charged with enforcement of rules, regulations and local and state laws on private property. *See* Tennessee Code Ann[otated section] 62-35-102(16)(C) (2003). Because security guards are explicitly authorized to prevent and detect any unlawful activity as well as enforce local and state laws, a security guard would have the authority to stop and question a suspicious individual on private property.

Tim Mason, owner of a private investigative agency and former MNPD officer, testified that he was familiar with the twenty percent rule. Mr. Mason recalled that this policy had been in effect since the late 1980's. He stated that there was a correlation between an establishment which primarily served alcohol and violence. Because of this correlation, Mr. Mason agreed that the private security guards of these establishments were the "first line of defense" against incidents of violence.

On cross-examination, Mr. Mason stated that organizations could apply for an exemption to the twenty percent rule, in order to hire off-duty MNPD officers, citing a "street fair" as an example. Mr. Mason said that he had visited Bikini Beach Bar for social and professional purposes and was only aware of one incident where Ms. Slate had to call the police. He also said that, whenever he visited the bar as a customer, the bar's patrons were well-behaved.

The trial court denied Defendant relief in a written order, stating that it would use the *Burroughs* "legitimate independent motivation" test in its analysis,[1] stating:

> [Mr. Gojkovic's] employer, Ms. Slate testified that Mr. Gojkovic's responsibilities as a bouncer and security guard involved maintaining order in the establishment, checking identifications, and assisting as a bar back—all functions advancing the interest of his employer, Bikini Beach Bar. Ms. Slate indicated it is not uncommon for personal items to be found in the bar, and when they are, these lost items are kept at the bar or in her office. Ms. Slate testified that when a phone has been left in the past, an employee might view the home image on the phone in attempt to determine to whom the phone may belong.
> . . . .
>
> There is no evidence of government knowledge and acquiescence when Mr. Gojkovic initially searched the Defendant's phone. Mr. Gojkovic did not communicate with the police until after he found the images, and per the previous testimony of Detective Carrigan, Mr. Gojkovic called dispatch because he had observed disturbing images and he wanted to turn over the phone to police. While a private security guard's search of a phone may be considered an intrusion into a patron's sense of privacy, such action does not arise to government intrusion.
>
> Moreover, the defense has not established that actions made by a private security guard are the equivalent of actions made by [a] law enforcement officer. The [Private Protective Services Licensing and Regulatory Act] which governs private security guards, does not grant plenary police powers.

Defendant filed a motion for permission to appeal, and the trial court denied the motion. Defendant agreed to plead guilty to count one of the indictment, reserving a certified question for appeal.

### *Certified Question/Plea Hearing*

During Defendant's plea submission hearing, the State presented the following facts as a basis for Defendant's guilty plea:

---

[1] The trial court noted that both the public function test and excessive entanglement test proffered by Defendant were used "to determine what constitutes state action in section 1983 civil action matter."

On September 18th of 2014, [D]efendant was at the Bikini Beach Bar on Antioch Pike in Nashville, Tennessee, which is located in Davidson County. He left his phone at the bar on the counter, and it was picked up by a security guard named Vladimir Gojkovic. Mr. Gojkovic looked into the phone to see who was the owner and found dozens of images of nude underage minors. He turned the phone over to police the next day[,] and when a search warrant was obtained, the phone was forensically examined and on it were over fifty images of children engaged in sex acts or were s[alaci]ously displaying their genitals and nude bodies.

Defendant pled guilty to one count of sexual exploitation of a minor involving less than one hundred images. Per the plea agreement, count two was dismissed, and Defendant reserved the following certified question of law:

Whether the initial examination and subsequent seizure of [D]efendant's cell phone by state[-]licensed private security guard Vladimir Gojkovic constituted "state action" in contravention of [D]efendant's rights pursuant to U.S. Constitution Amendment 4 and Tennessee Constitution Article I, Section 7, since no search warrant was issued allowing for such examination as required by *Riley v. California*, 134 S.Ct. 2473 (2014).

This certified question was incorporated into an Agreed Order entered June 20, 2019, stating that "the parties agree and the Court confirms [that the certified question] is dispositive of this case." The order further provided:

The parties agree that the search and subsequent seizure of [D]efendant's phone without a warrant [led] to the involvement of the Metropolitan Police Department who later obtained the proper warrants for the search of said phone and the electronic devices in [D]efendant's home. This evidence is the "fruit of the poisonous tree" and therefore inadmissible if the [a]ppellate [c]ourt determines that Mr. Gojkovic was in fact a "state actor" subject to the Constitutional restrictions cited above.

If the [a]ppellate [c]ourt agrees Mr. Gojkovic was indeed a "state actor" then the evidence that flowed from the illegal search and seizure must be suppressed and the case dismissed.

In the event the [a]ppellate [c]ourt affirms the decision of the [t]rial [c]ourt on these issues, [D]efendant shall be sentenced on Count 1 to [six] years at [thirty percent], (Range I), suspended, all but [one] year, day for

- 9 -

day, at [one hundred percent].[2]  Further, Defendant shall be placed on community corrections with sex offender treatment and subject to all of the requirements of the sex offender registry.

The parties agree that the Defendant shall be allowed to remain on bond pending appeal of this matter and the [] requirements of the sex offender registry or sex offender supervision shall be stayed pending said appeal.

## Analysis

Defendant argues that the trial court erred when it found that "the security guard who seized [Defendant's] phone . . . did not have 'an independent motivation' to assist law enforcement as required by *State v. Burroughs*, 926 S.W.2d 243, 246 (Tenn. 1996)." Defendant contends that Mr. Gojkovic was a "state actor" for the purposes of the Fourth Amendment.  He asserts that, because of the MNPD's twenty percent rule, "private security guards are the 'first line of defense' for the preservation of law and order" in those establishments.  Therefore, he contends that, in Davidson County, law enforcement had knowledge of and acquiesced to the role of private security guards in those establishments.  Defendant asserts that Mr. Gojkovic's handing Defendant's cell phone over to police showed that Mr. Gojkovic "intended to have [Defendant] investigated and/or prosecuted," and thus, he was a "state actor" acting in contravention of the search warrant requirement of the Fourth Amendment.

The State responds that Defendant's certified question is "overbroad" because a certified question regarding the validity of searches "must identify 'the reasons relied upon by the defendant in the trial court at the suppression hearing.'  [*State v.*] *Preston*, 759 S.W.2d [647,] 650 [(Tenn. 1988)]."  Alternatively, the State argues that Mr. Gojkovic was not a "state actor" but was a private party with legitimate independent motivation to search the phone, that he did not have the plenary authority of law enforcement to be a state actor, and that there was no excessive entanglement between his employment and the State.

### Certified Question

Tennessee Rule of Criminal Procedure 37 states that a "defendant may appeal from any judgment of conviction:

. . .

---

[2]  We will address the "day for day" provision of the sentence later in this opinion.

(2) on a plea of guilty or nolo contendere, if:

> (A) the defendant entered into a plea agreement under Rule 11(c) but explicitly reserved-with the consent of the [S]tate and of the court-the right to appeal a certified question of law that is dispositive of the case, and the following requirements are met:
>
> > (i) the judgment of conviction or order reserving the certified question that is filed before the notice of appeal is filed contains a statement of the certified question of law that the defendant reserved for appellate review;
> >
> > (ii) the question of law as stated in the judgment or order reserving the certified question identifies clearly the scope and limits of the legal issue reserved;
> >
> > (iii) the judgment or order reserving the certified question reflects that the certified question was expressly reserved with the consent of the [S]tate and the trial court; and
> >
> > (iv) the judgment or order reserving the certified question reflects that the defendant, the [S]tate, and the trial court are of the opinion that the certified question is dispositive of the case[.]

Tenn. R. Crim. P. 37(b)(2)(A).

The Tennessee Supreme Court has held that "the final order or judgment from which the time begins to run to pursue a T[ennessee] R[ule of] A[ppellate] P[rocedure] 3 appeal must contain a statement of the dispositive certified question of law reserved by defendant for appellate review and the question of law must be stated so as to clearly identify the scope and the limits of the legal issue reserved." *Preston*, 759 S.W.2d at 650.

> [W]here questions of law involve the validity of searches and the admissibility of statements and confessions, etc., the reasons relied upon by defendant in the trial court at the suppression hearing must be identified in the statement of the certified question of law and review by the appellate courts will be limited to those passed upon by the trial judge and stated in the certified question, absent a constitutional requirement otherwise.

*Id.* "Certified question[s] are overly broad when they mention a violation of a defendant's right but do not clearly outline the question beyond the right allegedly violated." *State v. William G. Barnett, Jr.*, No. M2013-01176-CCA-R3-CD, 2014 WL 1632080, at *5 (Tenn. Crim. App. Apr. 23, 2014), *no perm. app. filed*.

Additionally, "the order must state that the certified question was expressly reserved as part of a plea agreement, that the State and the trial judge consented to the reservation and that the State and the trial judge are of the opinion that the question is dispositive of the case." *Preston*, 759 S.W.2d at 650. The defendant has the burden of ensuring that the "prerequisites are in the final order and that the record brought to the appellate courts contains all of the proceedings below that bear upon whether the certified question of law is dispositive and the merits of the question certified." *Id.* If the certified question is not dispositive of the case, the appeal must be dismissed. *Id.*

A certified question is dispositive "when the appellate court must either affirm the judgment [of conviction] or reverse and dismiss [the charges]." *State v. Dailey*, 235 S.W.3d 131, 134 (Tenn. 2007) (quoting *State v. Walton*, 41 S.W.3d 75, 96 (Tenn. 2001)) (alterations in original) (internal quotations marks omitted). However, this court "is not bound by the determination and agreement of the trial court, a defendant, and the State that a certified question of law is dispositive of the case." *Id.* at 134-35 (quoting *State v. Thompson*, 131 S.W.3d 923, 925 (Tenn. Crim. App. 2003)). We must "make an independent determination that the certified question is dispositive." *Id.* (citing *Preston*, 759 S.W.2d at 651).

"The trial court's decision regarding a motion to suppress is not dispositive when there is additional, unchallenged evidence which could be used to support the conviction." *State v. Prince Dumas*, No. W2015-01026-CCA-R3-CD, 2016 WL 4083256, at * 2 (Tenn. Crim. App. Aug. 1, 2016) (citing *State v. William Jeffery Sweet*, No. E2008-00100-CCA-R3-CD, 2009 WL 2167785, at *11 (Tenn. Crim. App. July 21, 2009); *State v. John Whittington*, No. W2004-02405-CCA-R3-CD, 2005 WL 3059423, at *3 (Tenn. Crim. App. Nov. 10, 2005); *State v. Jared C. Brown*, No. M2004-02101-CCA-R3-CD, 2005 WL 2139815, at *5 (Tenn. Crim. App. Aug. 30, 2005); *State v. Kevin Bufford*, No. M2004-00536-CCA-R3-CD, 2005 WL 1521779, at *4 (Tenn. Crim. App. June 24, 2005); *State v. Michael Kennedy*, No. W2001-03107-CCA-R3-CD, 2003 WL 402798, at *3 (Tenn. Crim. App. Feb. 21, 2003)). "A certified question may be rendered nondispositive by the failure to raise an underlying issue when the determination of that underlying issue is necessarily the basis of the disputed question." *Id.* at *3.

In this case, we determine that the certified question was properly reserved pursuant to the requirements of Rule 37(b)(1)(A) and *State v. Preston,* 759 S.W.2d 647 (Tenn. 1988). Defendant entered a guilty plea pursuant to a plea agreement under Rule

11(c) and, with the consent of the State and the trial court, explicitly reserved a certified question that is dispositive of the case. *See* Tenn. R. Crim. P. 37(b)(2)(A)(iv). The question is specific and dispositive because, if Mr. Gojkovic acted as a "state actor" without a search warrant and violated Defendant's Fourth Amendment rights, then the trial court erred in denying his motion to suppress, and all evidence stemming from Mr. Gojkovic's initial search should be suppressed and the case dismissed.

The "Agreed Order" (the "Order") was entered on June 20, 2019, before the notice of appeal was filed on July 10, 2019, as required by Rule 37(b)(2)(A)(i), and "contain[ed] a statement of the certified question of law." Tenn. R. Crim. P. 37(b)(2)(A)(i). Moreover, as required by Rule 37(b)(2)(A)(ii), the "question of law as stated in" the Order "identifies clearly the scope and limits of the legal issue reserved" by stating that

> [t]he parties agree that the search and subsequent seizure of [D]efendant's phone without a warrant lead to the involvement of the Metropolitan Police Department who later obtained the proper warrants for the search of said phone and the electronic devices in [D]efendant's home. This evidence is the "fruit of the poisonous tree" and therefore inadmissible if the [a]ppellate [c]ourt determines that [Mr. Gojkovic] was in fact a "state actor" subject to the [c]onstitutional restrictions cited above.
>
> If the [a]ppellate [c]ourt agrees [that Mr. Gojkovic] was indeed a "state actor" then the evidence that flowed from the illegal search and seizure must be suppressed and the case dismissed.

This Order, which involved the validity of a search, identified "the reason[] relied upon by defendant in the trial court at the suppression hearing" as Mr. Gojkovic's acting as a state actor in contravention of the Fourth Amendment, and thus, the Order satisfies the *Preston* requirements. 759 S.W.2d at 650. Finally, the Order "reflects that the certified question was expressly reserved with the consent of the [S]tate and the trial court." *See* Tenn. R. Crim. P. 37(b)(2)(A)(iii). Therefore, the Order strictly complied with the requirements of Tennessee Rule of Criminal Procedure 37(b)(2)(A) and *Preston*.

*State Actor for Search and Seizure*

Standard of Review

A trial court's findings of fact are binding on this court unless the evidence in the record preponderates against them. *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the

evidence are matters entrusted to the trial judge as the trier of fact." *Id*. The trial court's application of law to the facts is reviewed under a de novo standard with no presumption of correctness. *Id.* (citing *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)).

Legitimate Independent Motivation Test

The United States and Tennessee constitutions protect citizens from unreasonable searches and seizures. U.S. Const. amend. IV; Tenn. Const. art. I, § 7; *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). In *State v. Burroughs*, our supreme court adopted the "legitimate independent motivation test" for determining whether a private individual acted as an agent of the State for purposes of the Fourth Amendment. 926 S.W.2d 243, 246 (Tenn. 1996). The "critical factors" in this analysis are: "(1) the government's knowledge and acquiescence; and (2) the intent of the party performing the search." *Id.* (quoting *United States v. Walther*, 652 F.2d 788, 792 (9th Cir. 1981)). "A private party acting for a reason independent of a governmental purpose does not implicate the Fourth Amendment." *State v. Cowan*, 46 S.W.3d 227, 232 (Tenn. Crim. App. 2000); *see also U.S. v. Shahid*, 117 F.3d 322, 326 (7th Cir. 1997) (stating that a shopping mall security guard who held shoplifters until the arrival of law enforcement "might also have intended to assist law enforcement" but that did not "transform him into a government agent so long as [he] had a legitimate independent motivation" such as providing safety and security for mall retailers).

Here, knowledge and acquiescence to Mr. Gojkovic's initial actions of examining the phone to identify its owner cannot be attributed to the State. While it is true that law enforcement officers in Davidson County were not permitted to work as private security in establishments deriving more than twenty percent of their revenue from alcohol, it does not follow that law enforcement tasked this security guard with searching lost cell phones for contraband, nor does it follow that law enforcement knew of or acquiesced to Mr. Gojkovic's search of Defendant's phone. Indeed, the trial court found that

> [t]here is no evidence of government knowledge and acquiescence when Mr. Gojkovic initially searched [D]efendant's phone. Mr. Gojkovic did not communicate with the police until *after* he found the images, and per the previous testimony of Detective Carrigan, Mr. Gojkovic called dispatch because he had observed disturbing images and he wanted to turn over the phone to police.

(emphasis added). We will not disturb these factual findings because the evidence does not preponderate against them. *Echols*, 382 S.W.3d at 277.

Further, Defendant's contention that the State "appoint[ed] private security guards to do their investigating" to "circumvent the protections of the Fourth Amendment" has no basis in the evidence. Mr. Shegog testified that, due to the twenty percent rule, law enforcement are aware that private security guards serve in establishments deriving greater than twenty percent of their revenue from alcohol sales. However, awareness of employment is not evidence that the State "appointed" these private security guards to act on their behalf, neither generally as "law enforcement" nor specifically regarding the search of Defendant's cell phone.

Moreover, the evidence shows that the intent of the party performing the search was to identify the owner of the phone. Mr. Gojkovic told Ms. Slate that he opened Defendant's cell phone in order to ascertain its owner. Indeed, the trial court found that

> Mr. Gojkovic found a smartphone left behind by [Defendant] at the Bikini Beach Bar. While Mr. Gojkovic cannot be located by the parties to testify in court about his intent, his employer, Ms. Slate testified that Mr. Gojkovic's responsibilities as a bouncer and security guard involved maintaining order in the establishment, checking identifications, and assisting as a bar back — all functions advancing the interest of his employer, Bikini Beach Bar. Ms. Slate indicated it is not uncommon for personal items to be found in the bar, and when they are, these lost items are kept at the bar or in her office. Ms. Slate testified that when a phone has been left in the past, an employee might view [the] home image on the phone in attempt to determine to whom the phone may belong.

The evidence does not preponderate against these factual findings. Thus, because Mr. Gojkovic acted with "a reason independent of a governmental purpose" when he searched for the identity of the phone's owner, his actions "[did] not implicate the Fourth Amendment." *Cowan*, 46 S.W.3d at 232. Moreover, assisting law enforcement after the initial search by giving the phone to police did not transform the security guard into a government agent. *See Shahid*, 117 F.3d at 326. Therefore, under the legitimate independent motivation test, the trial court did not err in finding that Mr. Gojkovic was not a state actor.

### Public Function Test

Defendant argues that, under the public function test, Mr. Gojkovic "was performing police functions by his actions." The Sixth Circuit explained that, under the public function test,

a private party is deemed a state actor if he or she exercised powers traditionally reserved exclusively to the [S]tate. The public function test has been interpreted narrowly. Only functions like holding elections, exercising eminent domain, and operating a company-owned town fall under this category of state action. Our sister circuits have consistently held that the mere fact that the performance of private security functions may entail the investigation of a crime does not transform the actions of a private security officer into state action.

*Chapman v. Higbee Co.*, 319 F.3d 825, 833-34 (6th Cir. 2003) (internal citations omitted).

The Tennessee Supreme Court has not adopted the public function test in determining whether a private party is a state actor for purposes of Fourth Amendment search warrant requirements. Nevertheless, even under the public function test, Mr. Gojkovic was not a state actor. Federal courts do not recognize a private security guard's mere assistance in a criminal investigation to be state action. *See id.*; *William Warinner, et al. v. N. Am. Sec. Sols., Inc.*, No. CIV.A.3:05-CV-244-S, 2008 WL 2355727, at *5 (W.D. Ky. June 5, 2008); *Bruce Friedrich, et al. v. Se. Christian Church of Jefferson Cty.*, No. CIV.A.3:04CV-741-S, 2005 WL 2333633, at *2 (W.D. Ky. Sept. 22, 2005); *Smith v. Detroit Entm't L.L.C.*, 338 F. Supp. 2d 775, 782 (E.D. Mich. 2004); *Wade v. Byles,* 83 F.3d 902, 905 (7th Cir. 1996); *Gallagher v. Neil Young Freedom Concert,* 49 F.3d 1442, 1457 (10th Cir. 1995); *White v. Scrivner Corp.,* 594 F.2d 140, 142-43 (5th Cir. 1979).

Further, Defendant mistakenly relies on *Romanski v. Detroit Entertainment, L.L.C.*, 428 F.3d 629 (6th Cir 2005), for his contention that Mr. Gojkovic in this case was performing a public function. In *Romanski*, the Sixth Circuit explained that, "[w]here private security guards are endowed by law with plenary police powers such that they are *de facto* police officers, they may qualify as state actors under the public function test." *Romanski*, 428 F.3d at 637; *see also Durante v. Fairlane Town Center*, 201 F. App'x 338, 341 (6th Cir. 2006) (stating that "the key distinction" between a private actor and a state actor under the public function test is "whether the private [actor]'s police powers delegated by the State are plenary, or merely police-like."). The court concluded that the security guard in *Romanski* was a state actor because "at all times relevant to [that] case, [the security guard] 'ha[d] the authority to arrest a person without a warrant as set forth for public peace officers'" as prescribed by statute. *Romanski*, 428 F.3d at 637 (quoting Mich. Comp. Laws § 338.1080).

Here, Mr. Gojkovic was not "endowed by law with plenary police powers such that [he was] a *de facto* police officer[.]" *See id.* Tennessee Code Annotated Title 62

Chapter 35 does not endow private security guards with plenary police powers; rather, a private security guard has the same power to arrest as any private citizen in Tennessee. *United States v. Charles E. Brooks*, No. 3:13-CR-00017, 2014 WL 413933, at \*12 (M.D. Tenn. Feb. 4, 2014) (concluding that, in "construing the [Tennessee Private Protective Services Licensing and Regulatory Act] and the Tennessee citizen's arrest statute [Tennessee Code Annotated section 40-7-109] in harmony, private security guards possess the same power to arrest as *private citizens* in Tennessee" and thus do not have plenary police powers). Mr. Gojkovic reported criminal activity to law enforcement and turned over evidence, as any private citizen may do. Thus, Defendant's reliance on *Romanski* is misplaced, and Mr. Gojkovic was not a state actor under the public function test.

Excessive Entanglement Test

Defendant argues that Mr. Gojkovic is a state actor because "the [S]tate is inextricably entwined with the security guard business through its regulatory scheme" and because "the Metropolitan Government of Nashville . . . has abdicated its responsibility for the maintenance of law and order in business establishments that derive over [twenty percent] of their revenue[] from the sale of alcoholic beverages[.]"

Defendant relies on *Brentwood Academy v. Tennessee Secondary School Athletic Association* for his contention that the State is "excessively entangled" with the private security business through its regulations. 531 U.S. 288 (2001). In *Brentwood Academy*, an association of schools regulating interscholastic athletics ("the Association") penalized a private school for violating one of its recruiting rules prohibiting "undue influence" when it wrote to incoming students and parents about spring football practice. *Id*. at 293. The private school sued, claiming a violation of the First and Fourteenth Amendments of the U.S. Constitution. *Id*. Eighty-four percent of the Association members were public schools, each represented by a public school principal or faculty member, and these Association representatives selected the "governing legislative counsel and board of control from eligible principals, assistant principals, and superintendents." *Id*. at 298. The United States Supreme Court concluded that,

> [t]here would be no recognizable Association, legal or tangible, without the public school officials, who do not merely control but overwhelmingly perform all but the purely ministerial acts by which the Association exists and functions in practical terms. Only the [sixteen percent] minority of private school memberships prevents this entwinement of the Association and the public school system from being total and their identities totally indistinguishable.

*Id*. at 299-300. The Court also noted that the "Association's ministerial employees are treated as state employees to the extent of being eligible for membership in the State retirement system." *Id*. at 300. The Court found that the Association was a state actor because "the entwinement down from the State Board" was "unmistakable, just as the entwinement up from the member public schools [was] overwhelming." *Id.* at 302.

Here, there is no such entwinement between private security guards and the State; the connection between private security and the State is nominal at best. Because of the twenty percent rule, by default, the establishment in this case was required to look to other forms of security, should it choose to have security at all. This choice by private establishments is not an affirmative action by the State to control, designate, or direct private security guards to act in a certain way in the course of their employment, as "excessive entanglement" requires. *See id*. at 299-300. Moreover, security guards do not benefit financially from the State by way of their employment, as the Association board members did in *Brentwood Academy*. *See id*. at 300. This issue is without merit, and Defendant is not entitled to relief.

*Day for Day Sentence*

We recognize that the relief we can grant in an appeal of a certified question is limited to either affirming the judgment of conviction or reversing and dismissing the charges. *Dailey*, 235 S.W.3d at 134. That limitation does not, however, preclude us from noting problems apparent in the record. Therefore, we note that the sentence proposed to be entered if we affirm the judgment of the trial court contains a provision requiring Defendant to serve the one-year period of confinement "day for day" at one hundred percent. Although the trial court may order one hundred percent service for a period up to one-year before Defendant may participate in work programs and earn work credits, the court cannot require a sentence to be served "day for day" so as to "preclude [Defendant] from earning good time credits under Tennessee Code Annotated section 41-2-111(b)." *Ray v. Madison Cty., Tennessee*, 536 S.W.3d 824, 839 (Tenn. 2017). Therefore, the proposed sentence requiring "day for day" service is a sentence that is "not authorized by the applicable statute or that directly contravenes an applicable statute." Tenn. R. Crim. P. 36.1(a)(2). The June 20, 2019 Agreed Order indicates that the sentence has not been entered and the June 20, 2019 Judgment states "stayed until appellate review." Before entry of the judgment of conviction, the trial court can either allow the parties to amend the plea agreement by omitting the "day for day" provision and enter the judgment accordingly, or the court can impose the sentence containing the "day for day" provision and address the sentence in the future under Tennessee Rule of Criminal Procedure 36.1(c) should either party file a motion to correct an illegal sentence.

- 18 -

## **Conclusion**

For the foregoing reasons, the judgment of the trial court is affirmed.


_____
ROBERT L. HOLLOWAY, JR., JUDGE